*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0587**

State of Minnesota,
Respondent,

vs.

Andrew Leonard Caruthers,
Appellant.

**Filed January 17, 2017
Affirmed
Larkin, Judge**

Hennepin County District Court
File No. 27-CR-15-11140

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Francis J. Rondoni, Mark J. Schneider, Golden Valley City Attorneys, Chestnut & Cambronne, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Kathryn J. Lockwood, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Hooten, Presiding Judge; Peterson, Judge; and Larkin, Judge.

UNPUBLISHED OPINION

**LARKIN**, Judge

Appellant challenges his conviction of fifth-degree assault, arguing that the evidence was insufficient to sustain the conviction. We affirm.

## FACTS

In April 2015, respondent State of Minnesota charged appellant Andrew Leonard Caruthers with fifth-degree assault and disorderly conduct. The complaint alleged that Caruthers confronted his son's hockey coach between periods at a hockey game and yelled at the coach, saying, "[L]et's go outside." Caruthers agreed to a bench trial, and the district court found him guilty of both charges. Caruthers appeals.

## DECISION

Caruthers contends that his "fifth-degree assault conviction must be reversed because the evidence was insufficient to prove that [he] possessed the required intent to cause fear of immediate bodily harm or death." He argues that "[t]he state failed to prove that when [he] asked [J.H.] whether he wanted to go outside, he intended to cause [J.H.] fear of immediate bodily harm or death."

When considering a sufficiency challenge, this court carefully analyzes the record to determine whether the evidence was sufficient to permit the fact-finder to reach its verdict. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). We "view the evidence in a light most favorable to the verdict and assume that the [fact-finder] believed the state's witnesses and disbelieved contrary evidence." *State v. Brocks*, 587 N.W.2d 37, 42 (Minn. 1998). This court will not disturb the fact-finder's verdict, if the fact-finder, acting with

2

due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was proved guilty of the offense charged. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004). We apply the same standard of review to sufficiency challenges stemming from court trials and jury trials. *Davis v. State*, 595 N.W.2d 520, 525 (Minn. 1999).

Whoever "commits an act with intent to cause fear in another of immediate bodily harm or death" is guilty of misdemeanor fifth-degree assault. Minn. Stat. § 609.224, subd. 1(1) (2014). Because intent is a state of mind, it is "generally proved circumstantially— by drawing inferences from the defendant's words and actions in light of the totality of the circumstances." *State v. Cooper*, 561 N.W.2d 175, 179 (Minn. 1997). A fact-finder "may infer that a person intends the natural and probable consequences of his actions and a defendant's statements as to his intentions are not binding on the [fact-finder] if his acts demonstrated a contrary intent." *Id.*

The state relied on circumstantial evidence to prove Caruthers's intent. An appellate court applies a heightened circumstantial-evidence standard when the state proves a disputed element of a criminal offense by circumstantial evidence. *State v. Al-Naseer*, 788 N.W.2d 469, 473-74 (Minn. 2010). When reviewing the sufficiency of circumstantial evidence to sustain a conviction, an appellate court first "identif[ies] the circumstances proved, giving deference to the [fact-finder]'s acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *State v. Anderson*, 789 N.W.2d 227, 241-42 (Minn. 2010) (quotation omitted). Second, this court "independently examine[s] the reasonableness of all

3

inferences that might be drawn from the circumstances proved, including inferences consistent with a hypothesis other than guilt" and determines "whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* at 242 (quotations omitted).

In this case, the trial evidence established the following circumstances. In January 2015, J.H.'s son and Caruthers's son were members of a youth hockey team. The ages of players on the team ranged from 13 to 15. J.H. was a member of the hockey team's coaching staff. Caruthers had been "verbally abusive" to the team's coaching staff, including J.H., during some of their games, standing over the bench, yelling at coaches, using profanity, and causing disruptions. Caruthers previously told J.H.'s wife that he was going to "kick [J.H.'s] a--" and told other parents that he was going to have his son "kick [J.H.'s] son's a-- on the ice." Caruthers also had a history of trying to fight other coaches.

The hockey team played a game in Golden Valley on January 31. Caruthers attended the game. Caruthers's son received a two-minute penalty during the second period of the game. After Caruthers's son received the penalty, coaches on the bench witnessed Caruthers giving his son a "high sign of two and ten" and then two thumbs up, which the coaching staff understood to mean that Caruthers was encouraging his son to commit a two-and-ten penalty.[1] When Caruthers's son returned to the game, he immediately and dangerously hit another player and committed a two-and-ten penalty.

---

[1] A two-and-ten penalty is imposed when a player commits a two-minute and ten-minute penalty in a single play. The offending player serves the ten-minute penalty and a teammate serves the two-minute penalty. Ten-minute penalties are awarded for "a dangerous type hit from behind" or head contact that appears to be intentional.

4

Pursuant to a team rule, the team's coaching staff took Caruthers's son out of the game after the second penalty.

The second period ended, and the players and coaches left for the locker room while the ice was being resurfaced. Caruthers walked at a fast pace down from the stands and was waiting in the players' tunnel for the coaches when they arrived. Caruthers yelled at the coaches stating, "How can you sit your best player?" and "You guys are a bunch of p-ssies." The coaches and the players entered the locker room, where they continued to hear Caruthers yelling outside of the closed locker-room door. Because Caruthers's conduct was disrupting the locker room to the point that the players were not listening to the coaches, J.H. left the locker room to try to diffuse the situation. As Caruthers stood approximately ten feet away from J.H., Caruthers motioned with his hands and yelled, "Let's go outside." J.H. told Caruthers that he was going to call Caruthers's parole officer. J.H. picked up his phone and called 911. Caruthers responded that he was not on parole and left the building. The police responded to the scene, but Caruthers had already left by the time they arrived.

At trial, Caruthers initially testified that he told J.H. to "come out and talk about it, meaning come out of the locker room." When asked by the prosecutor whether he said, "[L]et's go outside," Caruthers testified that he did not believe he used the word "outside." He further testified that if he "said 'outside' that meant outside of the locker room, not necessarily outside" and that "it was definitely for nothing other than to talk to [J.H.]." Caruthers explained that he wanted to talk to J.H. outside of the presence of the players. Despite this testimony, the district court found that Caruthers acted "with intent to cause

5

fear in another of immediate bodily harm." This finding indicates that the district court rejected Caruthers's testimony that he merely intended to communicate a request to talk to J.H. outside of the players' presence.

The totality of the circumstances proved supports the district court's inference regarding Caruthers's intent. Caruthers quickly walked down from the stands after the second period and confronted the coaches in the players' tunnel. He yelled at J.H. and the coaching staff. He used profanity. He eventually yelled, "Let's go outside" at J.H., while making hand gestures. These actions do not reasonably suggest that Caruthers merely wanted to talk with J.H. outside of the presence of the players.

Caruthers asserts that the circumstances proved support the reasonable inference that he did not specifically intend to cause J.H. to fear immediate bodily harm or death when he asked him to go outside. Caruthers argues that "[e]ven if the trial court rejected [his] testimony, there is still a reasonable inference that [he] did not intend to cause [J.H.] [f]ear of immediate bodily harm."

"Assessing the credibility of a witness and the weight to be given a witness's testimony is exclusively the province of the [fact-finder]." *State v. Mems*, 708 N.W.2d 526, 531 (Minn. 2006). In sufficiency cases, an appellate court construes the record most favorably to the state, especially where resolution depends on conflicting testimony because "weighing the credibility of witnesses is the exclusive function of the [fact-finder]." *State v. Pieschke*, 295 N.W.2d 580, 584 (Minn. 1980). "[T]he [fact-finder] is free to question a defendant's credibility, and has no obligation to believe a defendant's story." *State v. Ostrem*, 535 N.W.2d 916, 923 (Minn. 1995). This court will not consider

6

a witness's credibility on appeal. *State v. Garrett*, 479 N.W.2d 745, 747 (Minn. App. 1992), *review denied* (Minn. Mar. 19, 1992). Acceptance of Caruthers's hypothesis of innocence—that he merely intended to communicate a desire to talk to J.H. outside—would require us to ignore the district court's rejection of Caruthers's testimony regarding his intent, which we will not do.

Caruthers further argues that "[n]ot only was [his] request to [J.H.] to go outside ambiguous on its own, two witnesses other than [Caruthers] testified that it could mean 'let's talk' rather than a desire to cause fear of immediate harm." Caruthers's reliance on witness testimony that is favorable to his theory is unavailing because we construe the record in the light most favorable to the state.

Caruthers also argues that even if he "intended the invitation to go outside as an invitation to fight, that does not make him guilty of assault" because "[a]ny harm [J.H.] could have feared by [Caruthers's] invitation was not immediate." Caruthers argues that "[J.H.] would have first had to accept Caruthers's invitation and then go outside before he would have been subject to possible harm. By definition that is not immediate, it is delayed." We are not persuaded. Once again, the evidence established that Caruthers previously threatened to "kick [J.H.'s] a--" and that he was yelling and making hand gestures within approximately ten feet of J.H. when he yelled, "Let's go outside." Caruthers's behavior did not reasonably suggest that no harm would come to J.H. so long as he remained in the building.

In sum, Caruthers's proffered alternative hypothesis that he did not intend to cause J.H. to fear immediate bodily harm is not reasonable. The circumstances proved are

7

consistent with the district court's finding that Caruthers was guilty of misdemeanor fifth-degree assault and inconsistent with any rational hypothesis other than guilt. Because the district court could reasonably conclude, beyond a reasonable doubt, that the state proved Caruthers guilty of fifth-degree assault, we do not disturb the guilty verdict.

**Affirmed.**